UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | Case No. 3:21-cv-00419-ART-CLB |
| Plaintiff, | ORDER |
| v. | |
| DUSTIN DRUMMOND, | |
| Defendant. | |
| DUSTIN DRUMMOND, | |
| Counter Claimant, | |
| v. | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | |
| Counter Defendant. | |

Nationwide Mutual Insurance Company brings this action against Defendant and Counter Claimant, Dustin Drummond, seeking declaratory judgment that Mr. Drummond's Umbrella Insurance Policy Agreement with Nationwide does not cover an off-road vehicle accident in which Mr. Drummond was involved. Mr. Drummond brings counter claims alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Nevada Unfair Practices Act (NRS 686A.310, *et seq.*).

Before the court are Nationwide's motion for summary judgment (ECF No. 34), which requests judgment on all claims in favor of Nationwide, and Mr. Drummond's motion to exclude the testimony of expert witness Gary Selvin, Esq. (ECF No. 32). For the reasons identified below, the Court grants Nationwide's motion in full and denies Mr. Drummond's motion as moot.

//

//

1

## I.   FACTS

2    Sometime around March 2021, the Drummonds purchased a new home,

3    which they soon learned would not be covered under their current homeowners

4    insurance policy. (ECF No. 47-1 at 7:13-8:1.) They reached out to Haley Glinz, an

5    insurance agent for Movement Insurance, and decided to get a new homeowners

6    policy and to bundle that policy with several others under a single Nationwide

7    Umbrella Policy ("UP"). (ECF No. 34-5 at 118:8-119:2.)

8    On May 4, 2021, before the UP was finalized, the Drummonds emailed Ms.

9    Glinz to request help insuring their new vehicle, a Can-Am Maverick X-3 ("Can-

10   Am"). A Can-Am Maverick X-3 is similar to an ATV but intended for multiple

11   passengers.[1] (ECF No. 47-4.) Ms. Glinz provided the Drummonds with a quote

12   for a Safeco Policy covering the Can-Am, which they reviewed and approved. (ECF

13   No. 34-5 at 117:12-118:4; ECF No. 47-7.) Mr. Drummond claims to have believed

14   that his Safeco Policy was somehow connected to the UP and that his Can-Am

15   would be covered under the UP. (ECF No. 47-1 at 12:1-6.) But nothing in the

16   record indicates that Ms. Glinz told Mr. Drummond his Can-Am would be covered

17   under the UP or that Mr. Drummond explicitly asked for coverage of his Can-Am

18   under the UP. (ECF No. 47-1 at 9:18-23; *see* ECF No. 47-3 at 11:14-22.)

19   A few days after the Drummonds sent the above-referenced email, on May

20   17, 2021, the UP was finalized. (*See* ECF No. 47-6.) The UP did not list the Safeco

21   policy as one of its "listed underlying policies," meaning it was not among the

22   policies for which the UP generally provides coverage. (*See id.* at 6.) Mr.

23   Drummond reviewed the UP, including the section in which "listed underlying

24   policies" are identified. (ECF No. 34-5 at 21:8-12, 22:20-24.)

25

26   [1] *See* Off-Road Livin', *ATV vs. SXS/UTV: Differences, Benefits and Everything in Between*,
CAN-AM   BUYING   GUIDE   (Jan.   2021),   https://www.brp-world.com/kw/en/Our-

27   vehicles/can-am-off-road/blog/atv-vs-sxs-utv.html
[https://web.archive.org/web/20240411193016/https://www.brp-

28   world.com/kw/en/Our-vehicles/can-am-off-road/blog/atv-vs-sxs-utv.html].

Ms. Glinz has been the Drummonds' insurance agent since 2015. (ECF No. 34-5 at 10:16-21.) Though she has never had a written contract with the Drummonds, she has helped them obtain many insurance policies over the years, including several non-Nationwide policies, (*id.* at 11:7-13; ECF No. 47-1 at 5:6-13, 13:11-13; ECF No. 47-3 at 18:22-24); provided them guidance on which policies to purchase, (*see* ECF No. 47-3 at 10:17-11:13); and provided them with insurance-related services such paying premiums on their behalf, (ECF No. 34-5 at 18:2-11). Movement, Ms. Glinz's employer, has appointments with approximately 33 insurance companies and access to approximately 70 carriers across the country. (ECF No. 34-5 at 134:6-25.) Neither Movement nor Ms. Glinz is required to place all of their clients with Nationwide, (*Id.* at 133:21-24). Nationwide can reject any policy submitted by Movement, (*Id.* at 132:11-19); and Movement cannot modify or waive the terms of any Nationwide policy, (*Id.* at 133:1-6). Ms. Glinz has a written contract with Nationwide, is referred to as an "agent" in Nationwide's contracts, has a specific "agent number," and is granted the ability to take certain steps on Nationwide's behalf, such as to "bind subject to binding authority." (ECF No. 47 at 19.) She also receives a commission for policies she places with Nationwide. (*Id.*)

Mr. Drummond was in an accident in his Can-Am on August 1, 2021 while off-roading with friends. (ECF No. 7 at ¶ 14; *see* ECF No. 47-1 at 16:4-16.) His friends suffered injuries, (ECF Nos. 7 at ¶ 15; 47-1 at 16:17-25), and insurance claims were opened under Mr. Drummond's Safeco and Nationwide Insurance policies. (ECF No. 34-1 at ¶ 5.)

Mr. Drummond reported the accident to Safeco on August 1, 2021. (ECF No. 35 at 6.) He did not report the accident to Nationwide. (ECF No. 34-5 at 153:17-23.) Nationwide received notice of the Safeco claim on August 10, 2021. (ECF No. 34-1 at ¶ 5.) On August 11, Claim Specialist Nancy Klein opened a claim under Mr. Drummond's Personal Auto Policy. (*Id.* at ¶ 6.) On August 12, 2021,

1
2
3
4
5
6
7
8
9
10

she contacted Mr. Drummond to notify him that his claim would need to be re-opened under his Umbrella Policy instead. (*Id.* at ¶ 8.) The claim was reopened under the Umbrella Policy on August 13. (*Id.* at ¶ 10.) On August 30, 2021, Ms. Klein sent a status letter to Mr. Drummond advising him that Nationwide was still investigating his claim. (*Id.* at ¶¶ 26-27.) On September 13, 2021, Nationwide in-house counsel, outside counsel, and upper management met to discuss the claim. (*Id.* at ¶ 36.) On September 17, 2021, Nationwide issued a reservation of rights letter to Mr. Drummond informing him that he was not covered by the UP. (*Id.* at ¶ 39.) Nationwide filed their Complaint for Declaratory Relief the same day. (ECF No. 1.)

11
12
13

Nationwide brings this action seeking declaratory judgment that coverage of Mr. Drummond's accident is excluded under Exception 7.d of the UP. That exception bars coverage for any:

14
15
16

> "'occurrence' arising out of the ownership, maintenance, or use of . . . [a] **land motor vehicle**, trailer or semi-trailer unless insurance is provided by a "listed underlying policy" which is shown in the Declarations [section of the UP]."

17

(ECF No. 47-6 at 18 (emphasis added).)

18
19
20
21
22
23
24
25

Mr. Drummond brings counterclaims for (1) breach of contract, alleging that Nationwide materially breached the terms of the UP by failing to pay for damages related to the accident; (2) violation of the Nevada Unfair Practices Act (NRS 686A.310 §§ (b), (e)), alleging Nationwide unfairly contested his claim and unfairly delayed resolution of the claim; and (3) breach of the implied covenant of good faith and fair dealing, alleging effectively the same conduct as his Unfair Practices claim. (ECF No. 7 at 8-11.) Nationwide now requests summary judgment on all claims in its favor.

26

**II.   ANALYSIS**

27

**A. LEGAL STANDARD**

28

Summary judgment is appropriate when there is no genuine dispute as to

any material fact and the moving party is entitled to judgment as a matter of law. This means that if the evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact, the court can grant summary judgment in favor of the moving party. In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*,

477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## B. DECLARATORY JUDGMENT AND BREACH OF CONTRACT

To resolve Nationwide's declaratory judgment claim and Mr. Drummond's breach of contract claim, the Court must answer two questions: (1) does the language of Exclusion 7.d obviously and unambiguously bar coverage of Mr. Drummond's accident under the UP; (2) if Exclusion 7.d bars coverage, should Nationwide be equitably estopped from arguing against coverage because of certain misrepresentations made by its alleged agent, Haley Glinz.

### 1. Coverage on the Face of the UP

Nationwide argues that, since Exclusion 7.d applies to accidents involving land motor vehicles, and the Can-Am is a land motor vehicle, 7.d obviously and unambiguously excludes Mr. Drummond's accident from coverage under the UP. Mr. Drummond responds that there is an ambiguity as to the term "land motor vehicle," and Nevada law requires the Court to read any such ambiguity in his favor.

Federal Courts interpreting contracts apply the law of the state in which the contract was formed. *See, e.g., Travelers Property Cas. Co. of America v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008) (applying California law to the interpretation a California insurance contract). In Nevada, to preclude coverage under an insurance policy's exclusion provision, an insurer must:

(1) draft the exclusion in "obvious and unambiguous language," (2)

1

2

> demonstrate that the interpretation excluding coverage is the only reasonable interpretation of the exclusionary provision, and (3) establish that the exclusion plainly applies to the particular case before the court.

3 *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014) (citing *Powell*

4 *v. Liberty Mut. Fire Ins. Co.*, 252 P.3d 668, 674 (Nev. 2011)). An exclusion

5 provision is ambiguous if it "creates multiple reasonable expectations of coverage

6 as drafted." *Century Sur. Co.*, 329 P.3d at 616 (citing *Powell*, 252 P.3d at 672)

7 (internal quotation marks omitted). Even a seemingly clear provision "can be

8 rendered ambiguous when applying the [provision] to the facts leads to multiple

9 reasonable interpretations." *Century Sur. Co.*, 329 P.3d at 616. Any ambiguity

10 must be interpreted in favor of the insured and against the insurer when, as here,

11 the insurer drafted the policy. *Powell*, 252 P.3d at 672.

12      If an exclusion provision is unambiguous, a court may find that it does not

13 apply to a particular set of facts as a matter of law. *See United National Ins. Co.*

14 *v. Frontier Ins. Co., Inc.*, 99 P.3d 1153 (Nev. 2004); *Schroeder v. State Farm Fire*

15 *and Cas. Co.*, 770 F. Supp. 558 (D. Nev. 1991). Contract provisions are given

16 their plain meaning and read "according to common speech and usage and the

17 understanding of the average man. . . ." *Catania v. State Farm Life Ins. Co., Inc.*,

18 598 P.2d 631, 632-33 (Nev. 1979); *see also Webb v. National Union Fire Ins. Co.*

19 *of Pittsburgh, Pa.*, 207 F.3d 579, 581 (9th Cir. 2000) ("A policy's words and terms

20 are construed according to their plain, ordinary and accepted sense in the

21 common speech of man unless it appears from the policy that a different meaning

22 is intended.").

23      Exclusion 7.d states that:

24

> excess liability and additional coverages do not apply to . . . [a]n "occurrence" arising out of the . . . use of . . . [a] land motor vehicle, trailer or semi-trailer unless insurance is provided by a "listed underlying policy" which is shown in the Declarations [Section of the UP].

25

26

27 (ECF No. 47-6 at 18.) The Parties disagree over whether the term "land motor

28 vehicle" applies to Mr. Drummond's Can-Am Maverick X-3. Mr. Drummond does

7

1   not contest that the accident was an "occurrence," that his Safeco policy was not

2   a "listed underlying policy," or that the UP's excess liability insurance is the only

3   potential source of coverage for his accident under the UP.

4        Because the UP does not define "land motor vehicle," the Court must

5   interpret that term "according to common speech and usage and the

6   understanding of the average man." *Catania*, 598 P.2d at 632-33. In normal

7   parlance, "land" refers to the ground, as opposed to the air or the sea. *See Land*,

8   OXFORD ENGLISH DICTIONARY (3rd ed. 2024) ("The solid portion of the earth's

9   surface, as opposed to sea, water"). This aligns with the structure of Exception 7,

10  which divides its coverage exceptions into water (7.a), air (7.b), and land (7.d).[2]

11  The term "motor vehicle" most naturally means a mode of transport compelled by

12  a motor. *See Vehicle*, OXFORD ENGLISH DICTIONARY (3rd ed. 2024) ("A conveyance,

13  a form of transport"); *Motor* OXFORD ENGLISH DICTIONARY (3rd ed. 2024) ("A

14  machine that supplies motive power for a vehicle or other device with moving

15  parts . . ."); *Motor Vehicle*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2024) ("an

16  automotive vehicle not operated on rails").

17       In its plain meaning, then, "land motor vehicle" means: (1) any vehicle; (2)

18  which operates on land; (3) using a motor. This is the only reasonable

19  interpretation of the term, in the context of Exclusion 7.d. *Century Sur. Co.*, 329

20  P.3d at 616. As one district court explained, "[t]he term 'land motor vehicle' is

21  only ambiguous once attorneys get involved, not before." *DiPaolo*, 2011 WL

22  13305304, at *3 (D. Nev. 2011) (granting summary judgment in favor of an

23  insurance company because the term "land motor vehicle" unambiguously did

24  not apply to an airplane forced to make an emergency landing on a freeway).

25       None of the alternative definitions of land motor vehicle posited by Mr.

---

[2] Exception 7 also includes an exception for "motorcycle[s], motor scooter[s], motorized bicycle[s], [and] moped[s]." (ECF No. 47-6 at 18 (7.c).) This exception appears to have been added for the sake of thoroughness, and it does not render the meaning of "land" in Exception 7.d any less clear.

Drummond capture the common, ordinary meaning of the term as it appears in the UP. Mr. Drummond argues that the term "motor vehicle" includes only those vehicles designed for use on public roads and highways. (ECF No. 47 at 16-18). But ATVs, snowmobiles, and off-road motorcycles are commonly referred to as motor vehicles, despite generally being operated off-road. *See DiPaolo*, 2011 WL 13305304, at *3 (stating that the term "land motor vehicle" applies to "cars, trucks, and likely even bulldozers and snowmobiles.").

Mr. Drummond argues that the UP's use of the term "recreational motor vehicle" implies that the term "land motor vehicle" does not include vehicles that are used recreationally. But "land motor vehicle" and "recreational motor vehicle" are different terms, used in different portions of the UP. (*Compare* ECF No. 47-6 at 18 (Exclusion 10) (excluding from coverage a person's use of an "'auto', '*recreational motor vehicle*' or watercraft" when she lacks a reasonable belief that she is entitled to its use) (emphasis added) *with id.* (Exclusion 7.d).)

Mr. Drummond argues that the Court should adopt the definition of "motor vehicle" contained in NRS 485.050 ("[a] self-propelled vehicle which is designed for use upon a highway") or NRS 482.135 ("every device in . . . which any person . . . is or may be transported . . . upon a public highway"). But when "a provision in an insurance contract is unambiguous, a court will interpret and enforce it according to the plain and ordinary meaning of its terms." *Fed. Ins. Co. V. Coast Converters*, 339 P.3d 1281, 1285 (Nev. 2014). It will not "rewrite contract provisions that are otherwise unambiguous. . . ." *Id.; see also Sierra Pacific Power Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, Case No. 03:04-CV-0034-LRH (RAM), 2007 WL 2407037, at *3 (D. Nev. 2007) ("Nevada law generally requires a plain reading of the terms of the contract and only looks outside of the contract when ambiguities exist").

Finally, Mr. Drummond argues that inclusion of the term "land motor vehicle" in a list that also contains the terms "trailers" and "semi-trailers"

suggests that land motor vehicles, like trailers, must be intended exclusively for use on public roads and highways. But there is a logical leap between "trailers" and "vehicles intended exclusively for use on public roads," and the Court need not countenance this strained reading of 7.d. *See Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) ("If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.").

Because the term "land motor vehicle" obviously and unambiguously includes Mr. Drummond's Can-Am, Exclusion 7.d plainly applies to Mr. Drummond's accident. *Century Sur. Co.*, 329 P.3d at 616. The Can-Am is a "land motor vehicle," in part, because it has four wheels and an internal mode of propulsion, it does not operate on rails, and it is used to transport people over land. (ECF No. 34-5 at 183-85.) The accident was an occurrence because it was "an accident . . . [resulting in] bodily injury . . . caused by an insured." (ECF No. 47-6 at 12 (internal quotation marks omitted).) And, Mr. Drummond's Safeco policy, which insures the Can-Am, is not a "listed underlying policy" under the UP. (*See id.* at 6.)

### 2. Coverage through Estoppel

The Court next determines whether Mr. Drummond can estop Nationwide from arguing that that the UP does not cover his Can-Am. Mr. Drummond argues that estoppel should apply because Haley Glinz was an agent of Nationwide, and she made material misrepresentations that caused Mr. Drummond to believe his Can-Am would be covered under the UP. Nationwide responds that Ms. Glinz was actually Mr. Drummond's agent and that she made no misrepresentations related to the Can-Am's coverage under the UP.

The doctrine of promissory estoppel empowers courts to estop parties from arguing against the existence of a contract when four conditions are met: "(1) the party to be estopped must be apprised of the true facts; (2) he must intend that

his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped." *Branch Banking and Trust Company v. D.M.S.I., LLC*, 871 F.3d 751, 763 (9th Cir. 2017) (applying Nevada law). The actions of a company's agent can be attributed to that company for liability purposes or for equitable interventions like estoppel. *See, e.g.*, Restatement (Third) Of Agency § 2.04 (2006).

Mr. Drummond's estoppel argument falls short for two reasons. First, there are no facts in the record indicating that Ms. Glinz made a promise on which she intended Mr. Drummond to rely or that Mr. Drummond actually did rely on any such promise. Second, at the time Ms. Glinz secured Mr. Drummond's Safeco and Nationwide policies, she was acting as an agent of Mr. Drummond, not Nationwide, so her actions cannot be imputed to Nationwide for estoppel purposes.

### a. Promise and Reliance

Mr. Drummond claims that Ms. Glinz told him his Can-Am would be covered under the UP and that he relied to his detriment on that misrepresentation. (ECF No. 47 at 21.) But Mr. Drummond's position is not supported by the factual record.

"The promise giving rise to . . . promissory estoppel must be clear and definite, unambiguous as to essential terms, and the promise must be made in a contractual sense." *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203, 1209 (Nev. 2015) (citing 31 C.J.S. *Estoppel and Waier* § 116 (2008)). In other words, the promise must be real, and it must be "sufficient to induce reliance" on the promised act. *Id.* at 1210.

Here, the uncontested facts demonstrate that Ms. Glinz never told Mr. Drummond his Can-Am would be covered under the UP, and she never acted in

11

1   a way that suggested it would be covered. In the email thread in which Mr.

2   Drummond requested a policy covering his Can-Am, Ms. Glinz clearly

3   distinguished between the Nationwide UP and the other policies that might cover

4   the Can-Am. (ECF No. 47-4 at 3-4.) She did not suggest the Can-Am would be

5   covered under the UP, and certainly not in terms that were "clear," "definite," or

6   "unambiguous." *Torres*, 353 P.3d at 1209. In fact, Mr. Drummond stated in his

7   depositions that he did not recall any conversation in which Ms. Glinz suggested

8   the Can-Am would be covered by a Nationwide policy. (ECF No. 47-1 at 9:18-23;

9   *see also* ECF No. 47-3 at 11:14-22 (indicating Ms. Glinz does not recall presenting

10   Mr. Drummond with any quotes for Nationwide policies on his Can-Am.)

11        Even if Ms. Glinz's actions did constitute a promise, Mr. Drummond cannot

12   claim detrimental reliance on that promise. "There can be no promissory estoppel

13   where complainant's act is caused by his or her own mistake in judgment."

14   *Torres*, 353 P.3d at 1210 (citing 31 C.J.S. *Estoppel and Waiver* § 116 (2008)). Mr.

15   Drummond testified that he merely assumed his Can-Am would be covered under

16   the UP. (ECF No. 47-1 at 12:4-6.) In Nevada, parties to insurance contracts are

17   presumed to have read those contracts, *Farmers Ins. Exch. V. Young*, 832 P.2d

18   376, 379 n.2 (Nev. 1992), and Mr. Drummond did in fact read the UP, (ECF No.

19   34-5 at 21:8-12, 22:20-24). The UP does not list Mr. Drummond's Safeco policy

20   as a "listed underlying policy." (ECF No. 47-6.) Any belief that the Can-Am would

21   be covered was the result of Mr. Drummond's own mistake and not of any act or

22   omission by Ms. Glinz. *Torres*, 353 P.3d at 1210.

23        Mr. Drummond argues that he made no mistake in judgment because he

24   reasonably assumed the UP would cover his Can-Am. He specifically points to a

25   warning in the UP, which states: "changes or additions made to your Auto and

26   Homeowner policies may not be reflected on this Declarations [section]." (ECF No.

27   47-6 at 5.) Mr. Drummond claims this warning led him to reasonably believe that

28   his Safeco policy was not listed because it was new and that it would soon be

listed alongside his other policies.

Mr. Drummond's argument fails for two reasons. First, he raises the UP's warning for the first time on summary judgment, and he points to nothing in the record suggesting the warning affected his expectations of coverage before the accident. Legal arguments and memoranda "are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists." *British Airways Bd. v. Boeing*, 585 F.2d 946, 952 (9th Cir. 1978).

Second, Mr. Drummond had the opportunity to confirm his belief for several months. At any time between May 17 (the date of effective coverage) and August 1 (the date of the accident), Mr. Drummond could have checked if the UP had been updated to include his Safeco policy. If he had, he would have seen that his Safeco policy was never included as a listed underlying policy under the UP. Mr. Drummond cannot now claim he was unaware that the UP did not cover his Can-Am.

### b.  Ms. Glinz's Agency

Even if Ms. Glinz did make a misrepresentation, and even if Mr. Drummond reasonably relied on that misrepresentation, the misrepresentation cannot be imputed to Nationwide, because Ms. Glinz was not an agent of Nationwide at the time Mr. Drummond purchased his UP and Safeco policies.

In Nevada, "an agency relationship is formed when one who hires another retains a contractual right to control the other's manner of performance." *Grand Hotel Gift Shop v. Granite State Ins. Co.*, 839 P.2d 599, 602 (Nev. 1992). "The existence of an agency relationship is generally a question of fact for the jury if the facts showing the existence of agency are disputed, or if conflicting inferences can be drawn from the facts." *Schlotfeldt v. Charter Hosp. of Las Vegas*, 910 P.2d 271, 274 (Nev. 1996). But when the undisputed facts lead only to the inference that no agency relationship exists, Nevada courts have made no-agency

1    determinations as a matter of law. *Grand Hotel Gift Shop*, 839 P.2d at 603.

2         Nevada law presumes that independent insurance agents like Ms. Glinz are

3    agents of the insured and not the insurer, even when they are acting in a "dual

4    agency" capacity. *Id.* This is true even though Nevada statutes create certain

5    mandatory relationships between insurer and insurance agent. *See Id.* at 602. In

6    the past, Nevada courts have looked to a few factors to help determine whether

7    an independent insurance agent is an agent of an insurance company:

8         "(1) the insured's reliance on the agent's judgment and discretion in
          procuring insurance coverage, (2) the general rule that an
9         independent insurance agent is considered the agent of the insured,
          not the insurer, (3) in dealing with an insured, whether the agent
10        selected which insurance company to use, (4) whether the agent
          reviewed the insured's financial records and made recommendations
11        regarding coverage, (5) whether the agent knew that the insured was
          relying on him to explain the insurance policies he procured, and (6)
12        the general rule that even if the agent acts in a "dual agency"
          capacity, he is still the agent for the insured, not the insurer."

13

14   *Id.* at 603.

15        Courts have also considered the extent of the agent's relationship with the

16   insured, the number of other insurance companies the agent works with, the

17   percent of the agent's policies sold through the insurer, whether the insurer

18   placed restrictions on the sorts of people or entities to whom the agent could sell

19   insurance, and whether the insurer placed a quota on the number of policies the

20   agent referred to it. *See Id.*

21        It is undisputed that Ms. Glinz has been the Drummonds' insurance agent

22   since 2015, and she has helped them get several non-Nationwide policies over

23   the years. (ECF No. 34-5 at 10:16-21, 11:7-13; ECF No. 47-1 at 5:6-13, 13:11-

24   13; ECF No. 47-3 at 18:22-24.) It is also undisputed that Ms. Glinz kept the

25   Drummond's credit card information on file and would pay premiums on their

26   behalf, (ECF No. 34-5 at 18:2-11); she regularly made suggestions to the

27   Drummonds about which insurance policy to obtain, (*See* ECF No. 47-3 at 10:17-

28   11:13); and she and the Drummonds independently elected to enter the UP,

1    without input from Nationwide, (ECF No. 47-1 at 7:7-23).

2         Moreover, Movement, Ms. Glinz's employer, has appointments with

3    approximately 33 insurance companies and access to approximately 70 carriers

4    across the country. (ECF No. 34-5 at 134:6-25.) Neither Movement nor Ms. Glinz

5    is required to place all of their clients with Nationwide. (*Id.* at 133:21-24.)

6    Nationwide also has the opportunity to reject any policy submitted by Movement,

7    (*Id.* at 132:11-19), and Movement cannot modify or waive the terms of any

8    Nationwide policy. (*Id.* at 133:1-6.) These undisputed facts lead to only one

9    reasonable inference: Ms. Glinz was an agent of the Drummonds, not Nationwide,

10   when Mr. Drummond purchased his Umbrella Policy.

11        It is true that Nationwide refers to Ms. Glinz as an "agent" in certain policy

12   paperwork, assigns her an "agent number," and grants her powers like the ability

13   to "bind subject to binding authority." (ECF No. 47 at 19.) But this is standard

14   practice for an insurance broker, and it does not overcome the presumption in

15   Nevada law that an insurance broker is an agent of the insured, not the insurer.

16   *See Grand Hotel Gift Shop*, 839 P.2d at 602 (finding no agency relationship

17   between insurer and insurance agent despite the fact that the agent

18   countersigned the policy in question and was appointed as the insurer's "agent"

19   in Nevada); (ECF No. 47-3 at 13:16-18.)

20        Mr. Drummond argues that NRS 683A.321 establishes a statutory agency

21   relationship between Nationwide and Ms. Glinz. That statute distinguishes

22   between insurance agents and insurance brokers and establishes certain powers

23   and licensing requirements for each group. NRS 683A.321. But the court in

24   *Grand Hotel Gift Shop*, dismissed a similar argument, and it is not clear how the

25   statute in this case meaningfully differs from those in *Grand Hotel. See* 839 P.2d

26   at 602. As the Nevada Supreme Court explained:

27        Statutes requiring the registering or licensing of insurance agents
         have no effect on their powers to bind their principals, and do not
28       change the general laws of agency. Neither the license granted to an

15

insurance agent nor the statute under which it is issued define the authority of an insurance agent.

*Id.* (citing 16 John Alan Appleman & Jean Appleman, Insurance Law and Practice with Forms § 8671, at 182-83 (1981 & Supp. 1991)).

Because Mr. Drummond's equitable estoppel argument fails on the grounds identified above, the Court does not reach Nationwide's argument that Mr. Drummond should be barred from raising this issue for the first time in his response to Nationwide's motion for summary judgment. (*See* ECF No. 51 at 10-11.)

Because Exclusion 7.d of the UP clearly and unambiguously applies to Mr. Drummond's accident, and because estoppel is not warranted, the Court grants summary judgment in favor of Nationwide on its declaratory judgment claim and against Mr. Drummond on his breach of contract claim.

## C. DRUMMOND'S REMAINING COUNTERCLAIMS AND MOTION TO EXCLUDE

Mr. Drummond brings two remaining counterclaims: breach of the implied covenant of good faith and fair dealing and violation of the Nevada Unfair Practices Act. (ECF No. 7 at 8-11.) His Unfair Practices Act claim alleges that Nationwide violated NRS 686A.310(b) and (e), which prohibit insurance agencies from unfairly contesting valid insurance claims and unfairly delaying resolution of claims. (*Id.* at 8-9.) His breach of the implied covenant claim alleges that Nationwide unfairly denied him coverage. (*Id.* at ¶ 39.) Because Nationwide did not unreasonably delay resolution of Mr. Drummond's claim, and because its refusal to provide coverage was reasonable, both claims fail.

"To establish a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that the defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied." *Perry v. Jordan*, 900 P.2d

335, 338 (Nev. 1995). NRS 686A.310(b) prohibits insurers form "[f]ailing to acknowledge and act reasonably and promptly upon communications with respect to claims arising under insurance policies," and NRS 686A.310(e) prohibits them form "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear." While the issue of an insurer's bad faith is generally a matter of fact for the jury, *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 327 (Nev. 2009), it can be decided as a matter of law when, viewing the facts in the light most favorable to the plaintiff, a jury could not conclude that the insurer acted unreasonably, *cf. Neal v. Farmers Ins. Exch.*, 582 P.2d 980, 985 (1978).

None of the alleged facts suggest that Nationwide unreasonably delayed or denied Mr. Drummond's claim. It is undisputed that the entire claim investigation took just over one month (August 10, 2021 to September 17, 2021). (ECF No. 34-1 at ¶¶ 5, 39.) Nationwide has provided a detailed, unchallenged description of the steps that were taken within that period, which the Court has summarized in the facts section, above. (*See* ECF No. 34-1.) According to that description, Nationwide worked diligently to resolve the claim and communicated with Mr. Drummond where necessary about the state of his claim. (*See id.*) When Nationwide's claims agent noticed that Mr. Drummond's accident might not be covered by the UP, she immediately referred the issue for further review. (*Id.* at ¶ 14.) Mr. Drummond has not pointed to any request for communication to which Nationwide did not respond. He complains of a three-day period in which his claim was erroneously opened under his Personal Auto Policy before being closed and reopened under the UP, but this three-day filing error cannot constitute an unreasonable delay or denial of Mr. Drummond's claim.

Further, the Court's analysis of Nationwide's declaratory judgment claim demonstrates that that Nationwide's denial of Mr. Drummond's claim was not only reasonable but legally justified.

Read in the light most favorable to Mr. Drummond, the alleged facts cannot support a finding of bad faith. Thus, the Court grants summary judgment in favor of Nationwide on Mr. Drummond's claims for breach of the implied covenant of good faith and fair dealing and for violation of the Nevada Unfair Practices Act.

The Court does not reach Nationwide's argument that Mr. Drummond is not entitled to punitive damages because he has no surviving claim from which damages could flow.

Because all claims in this case have been resolved, Mr. Drummond's motion to exclude the testimony of Gary Selvin (ECF No. 32) is denied as moot.

**III.   CONCLUSION**

It is therefore ordered that Plaintiff/Counter Defendant Nationwide Mutual Insurance Company's motion for summary judgment (ECF No. 34) is granted.

It is further ordered that Defendant/Counter Claimant Dustin Drummond's motion to exclude the testimony of Gary Selvin (ECF No. 32) is denied as moot.

The Clerk of Court is directed to enter judgment in keeping with this order and close this case.

Dated this 7th day of May 2024.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

18